## IN THE CIRCUIT COURT OF TUNICA COUNTY, MISSISSIPPI

BILLIE JEAN JOHNSTONE                                              PLAINTIFF

vs.                                                    CIVIL ACTION NO. 2007-0137

G.D. SEARLE, LLC, ET AL.                                          DEFENDANTS

---

### CLERK'S CERTIFICATE

---

    I hereby certify that attached hereto is a true and correct copy of the entire file, including all process, pleadings, and orders, presented to this office for filing, docketed, and filed in this office as of this date in the above-referenced matter.

    IN WITNESS HEREOF, I have hereunto set my hand and seal of said Court of Tunica County, State of Mississippi, this 27th day of June, 2007.

SHARON GRANBERRY REYNOLDS, CLERK OF
CIRCUIT COURT OF TUNICA COUNTY,
MISSISSIPPI

BY: _____, D.C.



[SEAL]

EXHIBIT
A

IN THE CIRCUIT COURT OF
TUNICA COUNTY, MISSISSIPPI

BILLIE JEAN JOHNSTONE,                          §
                                                §
                                                §
        PLAINTIFF,                              §
                                                §
VS.                                             §          CIVIL ACTION NO. _2007-0137_
                                                §
G. D. SEARLE, LLC.                              §
(hereinafter "Searle") a subsidiary of          §
 PHARMACIA CORPORATION,                         §
(hereinafter "Pharmacia"), a Foreign            §
Corporation; MONSANTO COMPANY;                  §
PFIZER, INC., LINDSAY BURKES,                    §
RYAN HOOKER, WILLIAM SETH                       §
JOYNER, CHRISTOPHER POOLE,                      §
BRENT WATERS, STENNIS WELLS;                    §
and fictitious Defendants A, B, C and D         §
being those persons, firms or corporations      §
whose actions, inactions, fraudulent            §
suppression, fraud, scheme to defraud           §
and/or other wrongful conduct caused or         §
contributed to the Plaintiff's injuries and     §
damages, and whose true names and               §
identities are presently unknown to the         §
Plaintiff but will be substituted by            §
amendment when ascertained,                     §
                                                §
        DEFENDANTS.                             §

## COMPLAINT

### TRIAL BY JURY IS REQUESTED

**F I L E D**

MAY 1 1 2007

TUNICA COUNTY MISS.
SHARON BRANBERRY, CIRCUIT CLERK
BY _Nida Rusk, D. C._

1.      This is a civil action brought by Plaintiff, BILLIE JEAN JOHNSTONE, for

injuries resulting in heart attack.  Plaintiff was prescribed and used the prescription medication

CELEBREX (Celecoxib).  This action seeks monetary damages for personal injuries pursuant to

1

MS Code Ann. Sec. 11-7-13, damages caused by the drugs named herein and ingested by Plaintiff.

2.      Plaintiff, BILLIE JEAN JOHNSTONE is an adult resident of Tunica County, Mississippi.

3.      Plaintiff, BILLIE JEAN JOHNSTONE, was an adult resident of Tunica County, Mississippi at the time of her injury.

4.      Defendant G. D. Searle LLC. (hereinafter "Searle") is a subsidiary of Pharmacia Corporation, and is upon information, knowledge and belief an Illinois Corporation.  As such, Defendant Searle can be served through its principal address: CT Corporation System, 208 South LaSalle Street, Suite 814 Chicago, Illinois 60604.  At all times relevant hereto, Searle as a subsidiary of Pharmacia Corporation and Pharmacia Corporation (hereinafter "Pharmacia"); at all times relevant to this action was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib).

5.      Defendant Pharmacia Corporation is a Delaware Corporation licensed and registered to do business in Mississippi and can be served through its registered agent:  CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232.

6.      Defendant Monsanto Company (hereinafter "Monsanto") is the parent of Pharmacia and is a Delaware Corporation.  At all times relevant hereto Monsanto through its subsidiary companies was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib).   Defendant Monsanto is licensed and registered to do business in Mississippi, and may be served through its agent: Corporation Service Company, 506 South President Street Jackson, Mississippi 39201.

7.      Defendant Pfizer Inc. (hereinafter "Pfizer") is a Delaware corporation, and at all times relevant hereto Pfizer was in the business of marketing, selling and distributing the

pharmaceutical product Celebrex (Celecoxib). Defendant Pfizer is licensed and registered to do business in Illinois and may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232.

8.      Defendant Lindsay Burkes at all times material hereto was a sales representative for Defendant G. D. Searle, Pharmacia, Monsanto and Pfizer (hereinafter collectively referred to as "Pfizer") and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Burkes was a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Burkes can be served through the registered agent at Pfizer, Inc., c/o CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232. Defendant Lindsay Burkes, for diversity purposes, is a citizen of the state of Mississippi.

9.      Defendant Ryan Hooker at all times material hereto was a sales representative for the Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Hooker was a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Hooker can be served through the registered agent at Pfizer, Inc., c/o CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232. Defendant Ryan Hooker, for diversity purposes, is a citizen of the state of Mississippi.

10.     Defendant William Seth Joyner at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Joyner was a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Joyner can be served through the registered agent at Pfizer,

Inc., c/o CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232. Defendant William Seth Joyner, for diversity purposes, is a citizen of the state of Mississippi.

11.    Defendant Christopher Poole at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Poole was a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Poole can be served through the registered agent at Pfizer, Inc., c/o CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232. Defendant Christopher Poole, for diversity purposes, is a citizen of the state of Mississippi.

12.    Defendant Brent Waters at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's.  Upon information and belief, Defendant Waters was a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex.  Defendant Waters can be served through the registered agent at Pfizer, Inc., c/o CT Corporation System, 645 Lakeland East Drive Flowood, Mississippi 39232. Defendant Brent Waters, for diversity purposes, is a citizen of the state of Mississippi.

13.    Defendant Stennis Wells at all times material hereto was a sales representative for Pfizer Defendants and was acting within the coarse and scope of their employment with the Pfizer Defendant's. Upon information and belief, Defendant Wells is a resident of Mississippi and, at all times material hereto, was in the business of marketing selling and distributing Celebrex. Defendant Wells can be served at his home address: 2223 Wild Valley Drive Jackson, Mississippi 39211. Defendant Wells, for diversity purposes is a citizen of the state of Mississippi. (Defendants Lindsay Burkes, Ryan Hooker, William Seth Joyner, Christopher

4

Poole, Brent Waters, and Stennis Wells hereinafter "Sales Representative Defendants" or "Defendants").

14.    Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Tunica County, Mississippi, either directly or by agent, and have thus availed themselves of this jurisdiction.

15.    The Plaintiffs' claims accrued in whole or in part in this judicial district and resided in this judicial circuit prior to her injuries.  Some of these Defendants are foreign corporations, which have been and are currently engaged in business, directly or by authorized agent, in this judicial district.  Venue and jurisdiction are therefore proper.  The claims of Plaintiff herein satisfy the jurisdictional amount of this court.

16.    Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies.  Defendants Searle, Pharmacia, Monsanto, and Pfizer did manufacture, design, package, market and distribute this drug.    Defendants Searle, Pharmacia, Monsanto, and Pfizer (hereinafter "Removing Defendants" or "Defendants") encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects.  These Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, print and television advertisements.  These Defendants did this to increase sales and profits.

17.    At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their product so as to maximize sales and profits at the expense of the general public's health

and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

BACKGROUND

18.     Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies. The Removing Defendants Searle, Pharmacia, Monsanto and Pfizer did manufacture, design, package, market and distribute this drug. The Sales Representatives Defendants encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects. These Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, print and television advertisements. These Defendants did this to increase sales and profits.

19.     At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

20.     This Complaint seeks redress for damages sustained by BILLIE JEAN JOHNSTONE use of Celebrex (Celecoxib), manufactured and sold by Pharmacia, G.D. Searle, Monsanto and Pfizer, the Defendants herein.

6

21.    The Plaintiff was only 51 years old on or about May 13, 2004, when she suffered a heart attack due to the use of Celebrex (Celecoxib).

22.    The damages sought herein are the direct and proximate result of Defendants' wrongful conduct in connection with designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the prescription drug Celebrex (Celecoxib).

23.    At all times relevant hereto, Defendants were engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical drug Celebrex (Celecoxib) throughout the United States.

24.    Had Defendant properly disclosed the risks associated with using Celebrex (Celecoxib), BILLIE JEAN JOHNSTONE would not have taken it for treatment of pain associated with injury.

25.    This action is being brought in the Circuit Court of Tunica County, because the amount of recovery sought exceeds the jurisdictional levels of all lower courts.

A.    **Facts Regarding CELEBREX: Science And Other Cox-2 Inhibitors**

26.    CELEBREX is among a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxed (trade name Aleve®), and ibuprofen (trade name Advil®) are examples of well-known NSAIDs.

27.    NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase, COX-1 and COX-2. COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

7

28.    Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

29.    Traditional NSAIDs like aspirin, ibuprofen and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from inflammation and pain, but at the cost of potential adverse gastrointestinal effects, as the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrochloric acid present in the stomach. By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

30.    Defendants and other pharmaceutical companies set out to remedy these gastrointestinal side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production, thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation. Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and I2, which mediate inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining. By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDS that inhibit both COX-1 and COX-2.

31.    In making this decision, however, Defendants and their predecessors in interest either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected. By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, CELEBREX and other coxibs expose their users to a host of clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

8

32.    On June 29, 1998, SEARLE and PFIZER filed for FDA approval of Celecoxib, its first major COX-2 inhibitor drug, under the trade name CELEBREX.   The FDA granted preliminary approval of the new drug on December 31, 1998 for the relief of signs and symptoms of adult osteoarthritis and rheumatoid arthritis.   A year later, on December 23, 1999, the FDA granted accelerated approval of CELEBREX for a second indication; the reduction of intestinal polyps as an adjunct to endoscopy and surgery in patients with familial adenomatous polyposis (FAP), a rare genetic disorder.

33.    In late January 1999, following FDA approval, PFIZER publicly launched CELEBREX, their new "blockbuster" drug, in one of the largest direct-to-consumer marketing campaigns ever undertaken for prescription drugs.   PFIZER's massive marketing campaign fraudulently and misleadingly depicted CELEBREX as a much safer and more effective pain reliever than less inexpensive traditional NSAIDs.   Defendants and their representatives and agents misrepresented the safety profile of CELEBREX to consumers, the medical community, healthcare providers, and third party payors.

**B.    Facts Regarding Celebrex's Safety And Defendants' Knowledge Thereof**

34.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the FDA granted market approval in December 1998.   By 1997, and prior to the submission of the New Drug Application (the "NDA") for CELEBREX, Defendants were aware that, by selectively inhibiting only the COX-2 enzyme, CELEBREX altered the homeostatic balance between prostacylin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.  *See* Topol, E.J., *et al.*, *"Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* JAMA, August 22, 2001 at 954.

35.    Pharmacologist Dr. Garrett Fitzgerald of the University of Pennsylvania reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that contemporaneous with Defendants' launch it was known that selective COX-2 inhibitors, such as CELEBREX, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited

platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke. Fitzgerald, G.A., Patrono C., *"The Coxibs, Selective Inhibitors of Cyclooxygenase-2,"* N Engl J Med 2001;345:433-442.

36.    Early FDA updates in March and April of 1999 similarly acknowledged this known risk, but noted, based upon PFIZER's representations, that CELEBREX "does not affect platelet aggregation (clumping), an important part of the blood clotting process." *See* FDA Updates, *"New Arthritis Drug May Have Fewer Side Effects,"* FDA Consumer March-April 1999.

37.    Based on the studies performed on CELEBREX, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when CELEBREX was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors.

38.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of CELEBREX, Defendants failed to take any action to protect the health and welfare of patients, opting instead to continue promoting the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

### C.    CELEBREX and Cox-2 Studies Did Not Show CELEBREX to be Safe

### 1.    CELEBREX Long-Term Arthritis Safety Study (CLASS)

39.    In September 1998, PHARMACIA sponsored an allegedly independent CELEBREX Long-Term Arthritis Safety Study ("CLASS"). The multicenter, double-blind, parallel group study sought to compare the incidence of clinically significant upper gastrointestinal events between CELEBREX 400 mg BID and Ibuprofen 800 mg. (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000. CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

40.    On September 13, 2000, Defendants released the results of the CLASS study in the *Journal of American Medicine*.  Silverstein, F.E., *et al.*, *"Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial,"* 284 JAMA 1247 (2000). Researchers enthusiastically reported a "lower incidence of symptomatic ulcers and ulcer complications combined, as well as other clinically supported toxic effects, compared with NSAIDs at standard doses."

41.    Although Defendants touted the CLASS study as the primary evidence to support its theory that CELEBREX was safer for consumers who could not tolerate traditional NSAIDs in their gastrointestinal system, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the results, risks and defects of the CLASS study.  Among other things, Defendants failed to release the study's complete twelve month results releasing only the first six months of trials, reported biased and misleading results, limited conclusions to upper gastrointestinal events despite other known risks factors, and understated known cardiovascular risks.

42.    Despite Defendants' favorable CLASS Study conclusions, no other reviewing or administrative body was able to substantiate those findings.  The FDA Medical Officer Review of the CLASS data found CELEBREX to be no more efficacious than other traditional NSAIDS comparators.  *See generally*, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000.  According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib." (FDA CLASS Review).

43.    The FDA Arthritis Advisory Committee similarly found no "clinically meaningful" safety advantage of CELEBREX over older NSAIDs.  (FDA CDER Arthritis Advisory Committee, February 7th and 8th, 2001, Gaithersburg, Maryland).  The CLASS Study

11

failed to demonstrate a superior safety record over ibuprofen or pooled NSAID data. Based on this information, the Committee advised that further studies be done to assess the risk of COX-2 drugs and NSAIDS when taken with aspirin.

44.    In a June 2002 editorial, the *British Medical Journal* chastised the Study's "misleading" and "seriously biased" nature; noting that the complete results "clearly contradict[ed] the published conclusions," and warning against the dangers of "overoptimistic," "short-term" data and "post hoc changes to the protocol." Juni, Peter, *et. at., "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?"* BMJ 2002;324:1287-1288. Most noticeably, the CLASS study considered only six months of data despite the fact that researchers at that point had 12 months of data that, when analyzed as a whole, showed no significant difference. Instead of releasing the complete 12-month results from CLASS, PFIZER relied on and published only the first six months of data. JAMA 2000, 48:1455-1460. The results of the completed study revealed the real truth: CELEBREX offered no gastrointestinal (GI) benefit. Almost all ulcer-related complications that had occurred during the second half of the CLASS trials were in users of CELEBEX. These results clearly contradict the published CLASS conclusions.

45.    Editors of the Journal of the American Medical Association (JAMA) and other medical experts were reportedly "flabbergasted" when they realized they had been "duped" by only being provided with the first six months of CLASS data. Okie S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11. The *Washington Post* reported JAMA editors noting: "When all of the data were considered, most of CELEBREX's apparent [GI] safety advantage disappeared."

46.    Institutional bias also appeared to play a role in the Study's biased conclusions. According to the *Washington Post*, all sixteen CLASS authors were either employees of PHARMACIA or paid consultants of the company. Okie, S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11. Moreover, at least one author, Dr. M. Michael Wolfe, a gastroenterologist from Boston University, admits he was duped

by PHARMACIA.  In the summer of 2000, *The Journal of the American Medical Association* asked Wolfe to participate in the "six-month" trial.  Wolfe found the study, tracking 8,000 patients over a six-month period, persuasive, and penned a favorable review, which helped to drive up CELEBREX sales.  It was not until early the next year, while serving on the FDA's Arthritis Advisory Committee, that Wolfe learned the study had run for one year, not six months, as the company had originally led both Wolfe and the *Journal* to believe.  *Id.*  Here again, when the complete data was considered, most of CELEBREX advantages disappeared.

47.    Defendants also limited conclusions of the CLASS study to upper gastrointestinal events, despite other known risks factors, and understated known cardiovascular risks.  A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies, including CLASS, funded by the drug companies and two smaller ones—all for cardiovascular risks. Debabrata Mukherjee, *et al.*, *"Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* 286 JAMA 954 (2001).)  The metastudy found that PHARMACIA failed to identify and study cardiovascular risks for their products. The annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

48.    "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group . . . . Most deaths were cardiovascular in nature." FDA CLASS Review at 54.  The increased number of adverse cardiovascular events in the CELEBREX group was not surprising, as they were also revealed in the original New Drug Application (NDA) submitted for CELEBREX.  "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients.  In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any dose was cardiovascular." FDA CLASS Review at 78.

49.     Public Citizen, a public watchdog organization, also reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in the CELEBREX group versus 1.0% in either NSAID group. Specifically, the rate of heart attack in the CELEBREX was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

50.     Eric Topol of the Clevant Clinic reached a similar conclusion, noting that the CLASS trail MI rate was 1.6% in CELEBREX group (at a dosage of 400 mg twice a day) and 1.2% in the ibuprofen group for the 1739 patients taking low-dose aspirin. Topol noted that this numerical excess, albeit not statistically signification, was also found in the 6229 patients not taking aspirin in the trial. Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Based on this data, Topol and his colleagues concluded: "It is mandatory to conduct a trial specifically assessing cardiovascular morbidity." *Id.* Unfortunately, no such trials were ever initiated, delaying the official warnings of CELEBREX and jeopardizing countless lives in the process.

51.     The CLASS data proves that PFIZER knew that its first generation COX-2 inhibitor, CELEBREX, caused a disproportionately and statistically significant high number of adverse cardiovascular events before it was introduced to the market in January 1999. According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the cardiovascular risks of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of CELEBREX.

2.      **APC Trial**

52.     In early 2000, the National Cancer Institute (NCI), in collaboration with SEARLE and PFIZER, initiated the Adenoma Prevention with Celecoxib (APC) trial, a randomized, double-blind, placebo-controlled study to discover the efficacy of CELEBREX in preventing the growth of pre-cancerous colon polyps. N.ENG. J. MED. 352;11 at 1072. The trial involved 2026 patients across the country with randomization to one of three groups: (1) placebo; (2) 200 mg CELEBREX twice daily; and (3) 400 mg CELEBREX twice daily. The patients, each of whom had an adenomatous polyp removed before enrollment, were followed up for a mean of 33

14

months while taking the study drug, with the primary objective of limiting the development of colorectal cancer.

53.     On December 17, 2004, the National Cancer Institute suspended the use of CELEBREX for all participants in the APC trial due to "significant excess of cardiovascular death, myocardial infarction (MI) and stroke." Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Analysis by an independent Data Safety Monitoring Board (DSMB) showed a two to three fold increased risk of major fatal and non-fatal cardiovascular events for participants taking the drug compared to those on a placebo with a secondary dose-response effect.

54.     The absolute excess of major cardiovascular events of 13/1000 patients at the 800 mg dose (400 mg 2x day) was strikingly similar to the results of trials with rofecoxib and valdecoxib, both selective NSAID COX-2 inhibitors removed for the market for their significant cardiovascular risks. Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366.

55.     The FDA reported similar results, noting:

In the National Cancer Institute's Adenoma Prevention with Celecoxib (APC) trial in patients at risk for recurrent colon polyps, a 2-3 fold increased risk of serious adverse CV events was seen for CELEBREX compared to placebo after a mean duration of treatment of 33 months. There appeared to be a dose response relationship, with a hazard ratio of 2.5 for CELEBREX 200 mg twice daily and 3.4 CELEBREX 400 mg twice daily for the composite endpoint of death from CV causes, myocardial infarction (MI), or stroke.

April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.

56.     The dosage noted in the study is itself important for two reasons: first, there appears to be an association between dosage and the increase in adverse cardiovascular events; second, most patients increase dosage. PFIZER knew patients were increasing their dosages as noted in the CLASS Study: "Interestingly ... up to 70% of patients increased their dose for celecoxib." FDA CLASS Review at 74. Thus, PFIZER was aware of "dosage creep."

15

### 3.    Other CELEBREX Trials

57.    Several other CELEBREX trials also gave Defendants insight into the cardiovascular risks esented by CELEBREX. The Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as 3.6% with CELEBREX as compared to 2.7% for placebo.

58.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which reflected "the combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib. (p=0.03)." *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe. According to Dr. Sidney Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo." Id.

### 4.    Cox-2 Studies: VIGOR and APPROVe

59.    PFIZER also had access to other data which indicated a cardiovascular risk with its drugs. Specifically, PFIZER had knowledge of two studies conducted by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

### b.    VIGOR

60.    In 2000, The FDA Medical Officer Review of CLASS specifically noted the VIGOR trial and the concern over serious adverse cardiovascular events. FDA CLASS Review at 78.

61.    According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure

adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

62.    The VIGOR study comprised the most definitive scientific evidence ever obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold standard of medical research. It was a safety study with endpoints set in advance. As Merck stated many times, it was designed to provide definite proof of safety, convincing enough to silence the most skeptical critics. In medical terms, the VIGOR results raised the question of whether selective inhibition of COX-2 was a monumental mistake from the start. While the NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the cardiovascular risks of the arthritis population that needed these drugs on a daily basis. All makers of NSAIDs, including Defendants, were aware of these results.

### c.    APPROVe

63.    Anxious to put safety questions surrounding Vioxx to rest, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack)[1]. *Public Citizen*, January 24, 2005, at 15. Despite the available CELEBREX data and other information related to Vioxx, PFIZER never paused to reevaluate the CELEBREX data and studies.

64.    The scientific data available during and after CELEBREX's approval process made clear to Defendants that their formulation of CELEBREX would cause a higher risk of

---

[1] Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase in risk of heart attack was evident in as little as 4 months time.

blood clots, stroke and/or myocardial infarctions among CELEBREX consumers, alerting them to the need to do additional and adequate safety studies.

65.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans "it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

66.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

67.    Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of CELEBREX did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take CELEBREX. Therefore, Defendants' testing and studies were grossly inadequate.

68.    Had Defendants done adequate testing prior to approval and market launch, rather than the extremely short duration studies done on the small size patient base that was actually done, the Defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of CELEBREX consumers. Adequate testing would have shown that CELEBREX possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

69.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX sales.

18

70.    Defendants' failure to conduct adequate testing and/or additional testing prior to market launch was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

71.    At the time Defendants manufactured, advertised, and distributed CELEBREX to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAIDs.

**D.    Facts Regarding Defendants' Marketing And Sale Of CELEBREX**

72.    Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Plaintiffs, would not have purchased CELEBREX, a more costly prescriptive drug, ineffective for its intended purposes.

73.    Defendant's marketing was so fraudulent that the FDA issued three Warning Letters to Defendants in October 1999, April 2000, and November 2000, all finding that Defendants were unlawfully making false or misleading statements concerning the safety and/or efficacy of CELEBREX. The November letter cited two direct-to-consumer television advertisements that overstated the efficacy of CELEBREX. The FDA ordered that SEARLE immediately cease distribution of the misleading ads.

74.    On February 2001, the FDA issued a Warning Letter to PHARMACIA stating that promotional activities from marketing CELEBREX were unlawful because they were "false, lacking in fair balance, or otherwise misleading." The FDA found that CELEBREX had been promoted for unapproved uses, in unapproved dosing regiments, and that the marketers had made unsupportable claims that CELEBREX was safer and more effective than other NSAIDs.

75.    In August 2001, it was revealed that PHARMACIA had misrepresented the results of a post-marketing clinical study of CELEBREX when submitting it for publication. PHARMACIA selectively omitted portions of the data relating to adverse effects.    The *Washington Post* reported on August 5, 2001 that, "the study had lasted a year, not six months as . . .thought.  Almost all of the ulcer complications that occurred during the second have of the study were in CELEBREX users.  When all of the data were considered, most of CELEBREX's apparent safety advantage[as compared to traditional NSAIDs] disappeared."

76.    On January 10, 2005 the FDA again issued PFIZER a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 CELEBREX and 2 Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims."    Amid continued frustration with PFIZER's continually misleading marketing strategy and ever surmounting evidence of cardiovascular dangers, the FDA Advisory Panel voted overwhelmingly that the company should never again advertise the drug [CELEBREX]."

77.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive CELEBREX as a safer and better drug than its other NSAIDs and, therefore, purchase CELEBREX.

78.    Defendants widely and successfully marketed CELEBREX throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of CELEBREX in order to induce a widespread use and consumption. CELEBREX was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiffs' prescribing physicians.

79.    Despite knowledge of the dangers presented by CELEBREX, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of CELEBREX and failed to warn the public, including Plaintiffs, of

20

the serious risk of injury occasioned by the defects inherent in CELEBREX. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of CELEBREX, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiffs.

80.    In an elaborate and sophisticated manner, Defendants aggressively marketed CELEBREX directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include CELEBREX on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add CELEBREX to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of CELEBREX.

81.    Defendants represented that CELEBREX was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). Defendants promoted CELEBREX as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

82.    Yet, CELEBREX possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, CELEBREX, which is significantly more expensive than traditional

NSAIDs[2], was actually was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Yet, Defendants chose not to warn about these risks and dangers.

83.    Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved CELEBREX for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of CELEBREX.  Defendants' omission, suppression, and concealment of this important information enabled CELEBREX to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

84.    Consequently, CELEBREX captured a large market share of anti-inflammatory drugs prescribed for and used by patients.  In 2004 alone, sales of CELEBREX exceeded $2 billion, despite the significantly higher cost of CELEBREX as compared to other pain relievers in the same family of drugs.

85.    Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted CELEBREX as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of CELEBREX, Defendants were able to justify pricing CELEBREX significantly higher than the cost of generic aspirin.  In reality, that price inflation was not justified.  Had Defendants disclosed the truth about CELEBREX, Defendants would not and could not have reaped the billions of dollars in CELEBREX sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

86.    The Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of CELEBREX from Plaintiffs, the public, the medical community, and the regulators.  This concealment and omission was deliberate, knowing, active,

---

[2] The cost of Celebrex is at least $3-$6 per day, while an over-the-counter NSAID can cost $.50 or less per day.

and uniform, was intended to induce and maximize sales and purchases of CELEBREX, and prevented Plaintiffs from obtaining all the material information that would be important to them decision as a reasonable person to purchase, pay for, and/or use CELEBREX.

87.    Defendants' systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiffs to purchase, pay for, and/or use CELEBREX; and caused Plaintiffs' losses and damages as asserted herein.

88.    Had Defendants done adequate testing prior to approval and "market launch," the defendants' scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of CELEBREX consumers. Adequate testing would have shown that CELEBREX possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

89.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX sales.

90.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch," and active concealment and failure to warn the medical community and general public of the known cardiovascular risks of CELEBREX was particularly negligent, reckless and/or malicious given the drug's known target market. Defendants were well aware that most patients taking CELEBREX are elderly and have higher risk of developing cardiovascular risks to begin with. Nearly half of the patients with arthritis have coexisting cardiovascular disease, and most patients, as discovered in the CLASS study, were prone to higher dosing.

91.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

23

92.    At the time Defendants manufactured, advertising, and distributed CELEBREX to consumers including Plaintiffs, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAID drugs.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

93.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

94.    Defendants, directly or indirectly, negligently and/or defectively designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib).

95.    At all times material hereto, Defendants had a duty to users and/or consumers of Celebrex (Celecoxib), including Plaintiff, BILLIE JEAN JOHNSTONE, to exercise reasonable care in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib).

96.    Defendants breached that duty and were negligent in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib) in that: Celebrex (Celecoxib) was defective when put on the market by Defendants; that with such defect, Celebrex (Celecoxib) was reasonably certain to be dangerous when put to normal use; and that Defendants failed to use reasonable care in designing or making Celebrex (Celecoxib) or in inspecting it for defects. Specifically, Defendants breached their duty by, among other things:

a.    Failing to include adequate warnings that would alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug,

including BILLIE JEAN JOHNSTONE, to the potential risks and serious side effects of the drug;

b.     Failing to adequately and properly test and inspect the drug before placing the drug on the market;

c.     Failing to conduct sufficient testing and inspection of the drug which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death.

d.     Failing to adequately warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including BILLIE JEAN JOHNSTONE, of the potential risks and other serious side effects associated with the drug, including, among other things, heart attack, stroke, life threatening allergic and/or skin reactions and/or death;

e.     Failing to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the drug;

f.     Failing to recall and/or remove the drug from the stream of commerce despite the fact that Defendants knew or should have known of the defective and unreasonably dangerous nature of the drug, including the significant health risks associated with the use of the drug;

g.     Encouraging misuse and overuse while failing to disclose the side effects of the drug to the medical, pharmaceutical and/or scientific communities, and users and/or consumers, including BILLIE JEAN JOHNSTONE, in order to make a profit from sales.

97.    Defendants knew or should have known that Celebrex (Celecoxib) caused unreasonably dangerous risks and serious side effects of which users and/or consumers of the

drug, including Plaintiff, were not aware. Defendants nevertheless advertised, promoted, marketed, sold, distributed and/or supplied Celebrex (Celecoxib) knowing that there were safer methods for pain relief.

98.    As a direct, legal, proximate and producing result of the negligence of Defendants, BILLIE JEAN JOHNSTONE sustained substantial injuries including, among other things, a heart attack. This injury caused extensive pain and suffering and severe emotional distress and substantially reduced BILLIE JEAN JOHNSTONE's ability to enjoy life. In addition, Defendants' negligence caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

99.    As a direct, legal, proximate and producing result of the negligence of Defendants, BILLIE JEAN JOHNSTONE was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

100.    As a direct, legal, proximate and producing result of the negligence of Defendants, BILLIE JEAN JOHNSTONE required reasonable and necessary health care treatment and services and had incurred expenses therefore. Defendants' negligence was a contributing cause of Plaintiff's injuries and Plaintiff's economic and non economic loss. As a result of Defendant's negligence, Plaintiff has suffered and will continue to suffer.

101.    By reason of the foregoing, Plaintiff was damaged by the negligence and wanton and willful recklessness of the Defendants. The amount sought herein exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this matter.

SECOND CAUSE OF ACTION
STRICT PRODUCTS LIABILITY
DEFECTIVE DESIGN

102.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

103.    At all times material hereto, Defendants have engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing,

26

licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the drug Celebrex (Celecoxib), which is defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiff.

104.    At all times material hereto, Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following:

       a.    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Plaintiff, to risks which exceeded the benefits of the drug;

       b.    The drug was insufficiently tested;

       c.    The drug caused harmful side effects that outweighed any potential utility;

       d.    The drug was not accompanied by adequate labeling or instructions for use to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with its use;

       e.    In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that Celebrex (Celecoxib) should not have been marketed in that condition.

105.    At all times the drug Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed, it was expected to reach, and did reach,

users and/or consumers of the drug across the United States, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold.

106.    At all times, BILLIE JEAN JOHNSTONE used Celebrex (Celecoxib) for its intended or reasonably foreseeable purpose.

107.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff sustained substantial injuries including, among other things, heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced Plaintiff's ability to enjoy life. In addition, the defective and unreasonably dangerous condition of Celebrex (Celecoxib) caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

108.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries, caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

109.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff, BILLIE JEAN JOHNSTONE, required reasonable and necessary health care treatment and service and had incurred expenses therefore.

110.    By reason of the foregoing, BILLIE JEAN JOHNSTONE was damaged by the wanton and willful recklessness of the Defendants, who will be liable to Plaintiff. The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

THIRD CAUSE OF ACTION
STRICT PRODUCTS LIABILITY
FAILURE TO WARN

111.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

28

112.    Celebrex (Celecoxib) was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including BILLIE JEAN JOHNSTONE, to the dangerous risks and reactions associated with Celebrex (Celecoxib) when used for its intended or reasonably foreseeable purpose.  Those dangerous risks and reactions included, but were not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death and other serious and life threatening side effects.

113.    At all times, BILLIE JEAN JOHNSTONE used the drug for its intended or reasonably foreseeable purpose.

114.    BILLIE JEAN JOHNSTONE could not have discovered any defect in the drug through the exercise of care.

115.    Defendants, as manufacturers of a prescription drug, are held to the level of knowledge of an expert in the field.

116.    The warnings that were given by Defendants were not accurate or clear and/or were ambiguous.

117.    Defendants had a continuing duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with the use of Celebrex (Celecoxib).

118.    As a direct, legal, proximate and producing result of Defendant's failure to warn, BILLIE JEAN JOHNSTONE sustained harm, including, among other things, heart attack.  These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced BILLIE JEAN JOHNSTONE's ability to enjoy life.  In addition, Defendants' failure to warn caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

119.    As a direct, legal, proximate and producing result of Defendants' failure to warn, BILLIE JEAN JOHNSTONE was injured in health, strength and activity and suffered physical

injuries as well as mental anguish.   All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injuries and damages.

120.    As a direct, legal, proximate and producing result of Defendants' failure to warn, BILLIE JEAN JOHNSTONE required reasonable and necessary health care treatment and services and had incurred expenses therefore.

121.    By reason of the foregoing, BILLIE JEAN JOHNSTONE was damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff.  The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

### FOURTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY

122.    Plaintiff realleges all prior paragraphs of this complaint as if fully set out herein.

123.    The Removing Defendants and Sales Representatives Defendants made express representations to the consuming public at large through their aggressive marketing and advertising campaigns relative to their product, Celebrex.

124.    The Removing Defendants through their detail sales representatives, including Sales Representatives Defendants, made representations of the safety and efficacy of their product, Celebrex.

125.    Celebrex does not conform to the express representations made through the Defendants' advertising and marketing efforts

126.    Celebrex does not conform to the express representations made by Sales Representatives Defendants.

127.    Defendants' conduct in this matter was a contributing cause of injuries and damages suffered by Plaintiff.

30

128.    Wherefore, this Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

129.    Plaintiff repeats and realleges each of the allegations contained in the Complaint.

130.    Defendant is a "merchant" as defined in *Mississippi Code Annotated Uniform Commercial Code* § 75-2-104.

131.    Celebrex (Celecoxib) is a "good" as defined *Code Annotated Uniform Commercial Code* § 75-2-105.

132.    At the time that Defendants designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib), Defendants knew of the intended, reasonably foreseeable and/or ordinary use of Celebrex (Celecoxib) and impliedly warranted the drug to be of merchantable quality and safe and fit for such use.

133.    BILLIE JEAN JOHNSTONE, in ingesting Celebrex (Celecoxib), reasonably relied upon the skill and judgment of Defendants as to whether Celebrex (Celecoxib) was of merchantable quality and safe and fit for its intended, reasonably foreseeable and/or ordinary use.

134.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because the product was and is un-merchantable, in a defective condition and unreasonably dangerous and unfit for the intended, reasonably foreseeable and/or ordinary purpose for which it was intended as described above.

135.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because, among other things:

31
